## CLAY et al. v. FIRST NATIONAL BANK IN ARDMORE et al.

No. 21929. May 22, 1934.

As Modified on Denial of Rehearing June 19, 1934.

Application for Leave to File Second Petition for Rehearing Denied Jan. 8, 1935.

Brett & Brett, Thomas Norman, and Andrew B. Riddle, for plaintiffs in error.

Potterf, Gray & Poindexter, for defendants in error.

ANDREWS, J. This is an appeal by the defendants from an order of the district court of Carter county, Okla., that was made in a proceeding on execution. The parties will be referred to by name and as they appeared in the trial court.

In 1929 the plaintiff First National Bank of Ardmore obtained a judgment against C.

W. Clay, and others, on a supersedeas bond. On January 29, 1930, execution was levied upon lands shown by the sheriff's return to be property of the defendant C. W. Clay "not exempt from sale under execution." C. W. Clay filed a motion to quash the levy of execution as to the 160 acres of land described as the N.E.¼ of section 28, township 5 south. range 1 east, alleging that the same was his homestead. The sheriff was restrained by order of the court from selling the land claimed as homestead, pending the motion to quash, and the other land was sold under execution.

The plaintiff, First National Bank, filed its response to the motion to quash and asked that the defendant Mary Clay be made a party to the proceedings. She was made a party thereto by order of the court. C. W. Clay suggested to the court that Mary Clay was incompetent and the court appointed A. B. Riddle guardian ad litem, who filed for her a motion to quash the levy of execution as to the 160 acres which was alleged to be her homestead, to which the First National Bank filed its response.

After the return of the sheriff on the sale of the other lands, C. W. Clay filed an additional motion to quash, stating that since filing his original motion all lands owned by him had been sold on execution, except the 160 acres claimed as a homestead. The First National Bank filed its response to that motion.

The parties proceeded to trial upon the sole issue as to whether or not the 160 acres of land was the homestead of the defendants, C. W. Clay and Mary Clay, his wife. The court overruled the motions to quash, holding that the land was not exempt from execution. From that order or judgment of the court, an appeal was taken to this court.

The testimony of the defendant C. W. Clay in support of the motions to quash was, in substance, that he bought the land in controversy for a home and held it and had lived on it as such since January 11, 1921; that it is the only home he has; that owing to the mental condition of his wife she would not live on the farm; that he improved the land, fenced it, and built a barn and smokehouse on it; that he killed and cured meat and preserved fruit on the farm; that he farmed the land by hired help; that he went to Ardmore only occasionally; that he had had a stove and bed on the farm since 1921; that Mrs. Clay would come out to the farm and carry in vegetables; that he did not own the property in Ardmore where

Mrs. Clay was living and running a rooming house; that the rooming house did not make enough to support her; that he frequently told people that he bought the land in question for a home; that he was a member of the school board in the country school district for a while since 1921, and that he received his mail on the farm. Several witnesses testified that he lived a great part of his time on the farm, and that in serving process on him on one occasion a constable went to the residence in Ardmore where Mary Clay lived, and that she informed him that Mr. Clay lived on the farm. It is admitted that the Clays have no children and that their family consists of the two.

To controvert the testimony in support of the defendants' contention, the plaintiff relies upon certain testimony to the effect that C. W. Clay admitted that the Ardmore residence was their home from 1911 to 1921; that Mary Clay continued to live on the property in Ardmore; that she never stayed over night or cooked a meal on the farm; that when C. W. Clay went to Ardmore he stayed with his wife; that when he became sick while at the farm he went to Ardmore and remained with his wife for several weeks; that when he got his toe cut off he stayed there for eleven months; that the home in Ardmore stood of record in the name of Charles W. Clay from the time he acquired it in 1911 until March 25, 1930, just prior to the trial, when a deed to the property was placed of record, showing a conveyance of the same to W. H. Seago, whom the record shows to be a brother of Mary Clay; that the deed bears the date of July 26, 1927, and shows to have been acknowledged as of that date before Fay Rook, a notary public, and that the authority of the notary dates from July 28, 1927, two days after the deed shows to have been acknowledged. The record further shows that C. W. Clay and Mary Clay conveyed certain country property to W. H. Seago about the same time as the city property was conveyed; that it was the understanding between Seago and the Clays that they should have the use of the property in Ardmore and the farm property conveyed as long as they lived, without payment of rent. The statement of Seago concerning the recording of the deeds was, "My brother-in-law and sister wrote me several months ago asking that I record my deeds for record."

The testimony of C. W. Clay relative to the purchase price of the two parcels of property sold to Seago was indefinite and unsatisfactory. The record discloses that C. W. Clay voted in Ardmore primary and gen-

eral elections during all the time; that he was a registered voter in Ardmore at the date of the trial, and that when he rendered his property for taxation his residence was shown to be Ardmore.

The record further shows that on November 3, 1925, C. W. Clay signed an appearance bond for S. F. Haynie and scheduled the property in question as being property not exempt by law from execution, and that on February 26, 1925, he signed an appearance bond for Raymond Garrett and scheduled the same property as property not exempt by law from execution and specifically stated "not my homestead." This particular piece of property has been estimated to be worth from $125,000 to $200,000 and has several producing wells thereon.

Many assignments of error are presented by the defendants and considered in their brief under three contentions.

It is contended that C. W. Clay, the head of the family and the owner of the real estate, had a right to select the homestead, and that the property selected and occupied by him as a homestead is the homestead of his family, regardless of whether or not his wife resides there.

Section 1, article 12, of the Constitution of Oklahoma provides, in part, as follows:

"The homestead of any family in this state, not within any city, town, or village, shall consist of not more than one hundred and sixty acres of land, which may be in one or more parcels, to be selected by the owner. The homestead within any city, town, or village, owned and occupied as a resident only, shall consist of not exceeding one acre of land, to be selected by the owner. * * *"

The homestead contemplated by the Constitution is the home of the family. The homestead and exemption laws of Oklahoma were enacted in the interest of the family. They are family and not individual rights. Williams, Sheriff, v. Watkins, 93 Okla. 112, 219 P. 643. The homestead is for the benefit of the entire family, and such joint interest is to be regarded as paramount to the rights of any individual member thereof. Alton Mercantile Co. v. Spindel et al., 42 Okla. 210, 140 P. 1168.

In Greenshaw v. Brown, 96 Okla. 11, 219 P. 934, this court held:

"Although, under the provisions of the Constitution and statutes of Oklahoma, the homestead of the family is exempt from attachment, the right to exemption cannot originate without the existence of a family

—of a household consisting of more than one person—yet, when the homestead character has once attached, it may persist for the benefit of a single individual who is the sole surviving member of the family. The exemption, however, does not extend any further than to the immediate members of the family; in other words, it does not extend further than to the surviving husband or wife and their minor children."

The defendants contend that the homestead right to the 160 acres of land attached in 1921, and that there is no evidence that the status of that property changed from 1921 to the date of the trial. If this property was impressed with a homestead right it was in 1921. The evidence conclusively shows that the family of C. W. Clay consisted of himself and wife and that the wife remained in their old homestead in Ardmore alleged to have been sold to Seago and in which both she and her husband had been given a life estate, if in fact the property was sold in good faith as contended. Mary Clay did not occupy the country property and expressed no intention to occupy the same as a homestead. In order that land may be impressed with a homestead right it must be occupied by the family, either actually or constructively, and not by a member of the family only. Dobson et al. v. Shoup (Kan.) 43 P. 817. The fact that C. W. Clay, the owner, occupied the property as a residing place while he cultivated the farm, spending part of his time with his wife in the Ardmore place, where his wife was running a rooming house, is not sufficient. Koons v. Rittenhause, 28 Kan. 357. The question presented is not the right of one person to claim a homestead right to homestead property after the family relation has been dissolved under the provisions of section 1223, O. S. 1931.

It is contended that the actions of C. W. Clay in signing bonds did not change the homestead character or estop the defendants from claiming the property as a homestead. However, those actions evidence whether or not the land had been adopted as a homestead. Neither living on land for a while nor publicly declaring it to be a homestead will make it a homestead any more than publicly declaring property not to be a homestead or signing bonds will destroy the homestead character of land. However, such declarations and actions may evidence a fact.

The third contention presented is that the trial court erred in holding that the family may be deprived of its homestead rights to satisfy debts and obligations to which the

228

wife was not a party and which are not by statute made liens against the homestead.

The objection to that contention is that it disregarded the question to be determined by the court, which is whether or not the property was adopted as the homestead when it was purchased. It is not contended that the same was adopted as the homestead after the making of the statements hereinbefore stated.

The trial court found that the property was subject to execution, which was equivalent to finding that the property was not the homestead of the family. That finding was not against the clear weight of the evidence.

The judgment of the trial court is affirmed.

RILEY, C. J., CULLISON, V. C. J., and SWINDALL, McNEILL, OSBORN, and BAYLESS, JJ., concur. BUSBY and WELCH, JJ., absent.

---

Supplemental Opinion on Rehearing.

SWINDALL, J. On rehearing it is seriously contended by plaintiff in error that the opinion in this case conflicts with the opinion of the court in the case of Clay v. Brown, 161 Okla. 221, 17 P. (2d) 379. We cannot agree with that contention. In the Brown Case the evidence is not set out in the opinion as fully as in this case, but a careful examination of the record, briefs, and petition for rehearing discloses much evidence relative to the property involved in this action not being the homestead of Charles W. Clay that was not produced in the Brown Case. The First National Bank of Ardmore and E. A. Hooven were not parties to that case. Former judgment cannot be made basis of plea of res judicata unless suit was between parties or their privies. Airy v. Thompson, 154 Okla. 1. 6 P. (2d) 445; Pepin v. W. R. Thompson & Sons Lbr. Co., 150 Okla. 295, 1 P. (2d) 714, see discussion at page 716 in 1 P. (2d). Counsel for plaintiff in error seem to recognize the rule announced in the cited cases, for at page 97 of the record we find the following:

"By the Court: I was wondering if there was not some way to hold this up until the Supreme Court passes on this other case. (The Brown Case.) By Mr. Brett (of counsel for Chas. W. Clay): We want this case tried, as this case is entirely different, and we have some evidence that was not produced in the other case, and we want this one tried, and whichever way it goes we want a judgment rendered. By the Court: I will try it, however. I may use my own

pleasure about when I render judgment. By Mr. Brett (of counsel for Chas. W. Clay): That is all right."

The record shows that Charles W. Clay signed the appearance bond of S. F. Haynie. The justification is not signed by Clay, but he admits he wrote his own name in the justification, and wrote in the description of the property involved in this action (C.-M. 116). He signed three appearance bonds for Raymond Garrett. The first criminal appearance bond of Raymond Garrett was not offered in evidence in the Brown Case. It shows that in the justification Clay listed the land here involved as not his homestead (C.-M. 266). The same is true as to the second and third appearance bonds of Garrett. We could call attention to much more evidence in this case that is not in the Brown Case. The record convinces us that the judgment is not against the clear weight of the evidence, but, on the contrary, is sustained by the weight of the evidence. The qualifications on the appearance bonds show that it was not the intention of Clay in good faith to occupy the land as a homestead. As to these bonds, Mr. Clay, "Thine own mouth condemneth thee, and not I, Yea, thine own lips testify against thee."—Job 15:6.

Petition for rehearing denied.

RILEY, C. J., CULLISON, V. C. J., and ANDREWS, McNEILL, OSBORN, BAYLESS, BUSBY, and WELCH, JJ., concur.